*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-2082
A25-2083**

Ricky Lee McDeid,
Appellant (A25-2082),

vs.

Nancy Johnston, CEO/Director, Minnesota Sex Offender Program, et al.,
Respondents,

Shane P. Garry,
Appellant (A25-2083),

vs.

Nancy Johnston, CEO/Director, Minnesota Sex Offender Program, et al.,
Respondents.

**Filed July 6, 2026
Reversed and remanded
Johnson, Judge**

Ramsey County District Court
File Nos. 62-CV-19-8232, 62-CV-19-8234

Andrew J. Pieper, Marc A. Al, Stoel Rives, L.L.P., Minneapolis, Minnesota; and

Roxanna V. Gonzalez, Caroline J. Rogers, Dorsey & Whitney, L.L.P., Minneapolis, Minnesota (for appellants)

Keith Ellison, Attorney General, Benjamin C. Johnson, João C.J.G. de Medeiros, Emily Doyle, Assistant Attorneys General, St. Paul, Minnesota (for respondents)

Considered and decided by Johnson, Presiding Judge; Ede, Judge; and Bond, Judge.

**NONPRECEDENTIAL OPINION**

**JOHNSON**, Judge

Ricky Lee McDeid and Shane P. Garry were civilly committed to the Minnesota Sex Offender Program (MSOP). They separately sought reductions in their custody levels by petitioning for transfers to Community Preparation Services (CPS). The commitment appeal panel (CAP) granted their petitions and ordered that they be transferred to CPS. McDeid and Garry were not transferred to CPS until 796 days and 902 days after the effective dates of their CAP transfer orders, respectively. In these consolidated appeals, McDeid and Garry claim that Nancy Johnston, the executive director of MSOP, and Jodi Harpstead, the commissioner of human services, violated their constitutional rights to due process. The district court granted respondents' motion for summary judgment. We conclude that there is a genuine issue of material fact as to whether Johnston and Harpstead transferred McDeid and Garry to CPS within a reasonable time after their CAP transfer orders. Therefore, we reverse and remand for further proceedings.

**FACTS**

The essential facts and procedural history relevant to this appeal have been thoroughly described in three prior appellate opinions and need not be repeated here. *See McDeid v. Johnston*, Nos. A21-0042 & -0043, 2021 WL 3277218 (Minn. App. Aug. 2, 2021) (*McDeid I*) (subsequent history omitted); *McDeid v. Johnston*, 984 N.W.2d 864 (Minn. 2023) (*McDeid II*); *McDeid v. Johnston*, Nos. A21-0042 & -0043, 2023 WL 4417496 (Minn. App. July 10, 2023) (*McDeid III*).

In *McDeid III*, this court concluded that McDeid and Garry had sufficiently pleaded claims of violations of their rights to procedural due process, and we remanded the cases to the district court for further proceedings. 2023 WL 4417496, at *4. Johnston and Harpstead filed answers, and the parties engaged in discovery. In May 2025, McDeid and Garry jointly moved for summary judgment. In June 2025, Johnston and Harpstead jointly filed a cross-motion for summary judgment. In September 2025, the district court granted Johnston and Harpstead's motion and denied McDeid and Garry's motion. McDeid and Garry filed separate appeals, which this court consolidated.

## DECISION

McDeid and Garry (hereinafter appellants) argue that the district court erred by denying their motion for summary judgment and by granting the cross-motion for summary judgment filed by Johnston and Harpstead (hereinafter respondents). Appellants raise three issues on appeal: first, whether respondents violated their constitutional right to procedural due process; second, whether respondents are entitled to qualified immunity; and, third, whether appellants are entitled to compensatory damages. Respondents address the same three issues in their responsive brief in arguing for affirmance.

A district court must grant a motion for summary judgment "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.01. The evidence must be viewed in the light most favorable to the nonmoving party. *Henry v. Independent Sch. Dist. No. 625*, 988 N.W.2d 868, 880 (Minn. 2023). A genuine issue of material fact exists if a rational trier of fact, considering the record as a whole, could find for the nonmoving party. *Frieler v.*

3

*Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 564 (Minn. 2008). This court applies a *de novo* standard of review to a district court's grant of a motion for summary judgment. *Henry*, 988 N.W.2d at 880.

## I. Due Process

Appellants' primary argument is that the district court erred by concluding that respondents are entitled to summary judgment, and that appellants are not entitled to summary judgment, on appellants' sole remaining claim that respondents violated their rights to procedural due process.

The federal statute on which appellants' claims are based creates a cause of action if a person, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (2024). Appellants have alleged and seek to prove that respondents violated their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which provides that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

The supreme court has explained the general analytical framework for a procedural-due-process claim as follows:

> When engaging in a due process analysis, a court must conduct two inquiries. First, the court must determine whether the complainant has a liberty or property interest with which the state has interfered. Second, if the court finds a deprivation of such an interest, it must determine whether the procedures attendant upon that deprivation were constitutionally sufficient.

4

*Carrillo v. Fabian*, 701 N.W.2d 763, 768 (Minn. 2005) (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)).

### A.

We begin by addressing the first part of the two-part inquiry: whether appellants have a protected liberty or property interest with which the state has interfered. *See id.* The parties dispute whether a protected interest exists.

### 1.

We first consider whether appellants have a protected liberty interest. "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466-67 (1983). A person's "interest in not being involuntarily confined indefinitely" is of the first type of protected liberty interest, an interest that is protected by the Due Process Clause. *Addington v. Texas*, 441 U.S. 418, 425, 427 (1979) (holding that "interest in outcome of civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence").

The second type of protectible liberty interest exists if a state statute "create[s] liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Vitek v. Jones*, 445 U.S. 480, 488 (1980) (holding that state statute requiring finding of mental illness created liberty interest in not being transferred to mental hospital); *see also Wolff v. McDonnell*, 418 U.S. 539, 555-58 (1974) (recognizing

5

that state-created right to good-time credits constituted liberty interest protected by the Due Process Clause). "A constitutionally-protected liberty interest arises from a legitimate claim of entitlement rather than simply an abstract need or desire or a unilateral expectation." *Carrillo*, 701 N.W.2d at 768. Whether a state statute "provides a protectible entitlement must be decided on a case-by-case basis." *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 12 (1979).

A state may create a liberty interest "by placing substantive limitations on official discretion" and "mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Thompson*, 490 U.S. at 462 (quotation omitted); *see also Rew v. Bergstrom*, 845 N.W.2d 764, 785 (Minn. 2014) (applying *Thompson*); *Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632 (Minn. 2012) (same); *State ex rel. Browneagle v. Schnell*, 957 N.W.2d 446, 460 (Minn. App. 2021) (same).[1] In other words, a state-created liberty interest exists if state law "contain[s] explicitly mandatory language, *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Thompson*, 490 U.S. at 463 (quotation omitted).

In this case, state law plainly contains both substantive predicates and mandatory language. As the supreme court explained in *McDeid II*, state statutes "vest the CAP with the *exclusive* authority to order a transfer, provisional discharge, or discharge of those

---

[1]In *Browneagle*, this court followed federal circuit court opinions in recognizing that the holding in *Sandin v. Conner*, 515 U.S. 472 (1995), is "limited to cases concerning prison discipline or internal prison regulations." 957 N.W.2d at 459 n.2 (citing *Carver v. Lehman*, 558 F.3d 869, 872-73 n.5 (9th Cir. 2009), *cert. denied*, 558 U.S. 973 (2009), and *Ellis v. District of Columbia*, 84 F.3d 1413, 1417-18 (D.C. Cir. 1996)). We recognized that pre-*Sandin* caselaw continues to apply outside the prison context. *Id.*

committed as a sexually dangerous person or a person with a sexual psychopathic personality." 984 N.W.2d at 869, 874 (citing Minn. Stat. § 253B.19, subd. 1 (2022), and Minn. Stat. § 253D.27, subd. 4 (2022)). The CAP determines "whether the party seeking transfer to CPS has met his burden of proving transfer is appropriate." *Id.* at 875 (quoting Minn. Stat. § 253D.28, subd. 3 (2022)). "If the CAP decides transfer is appropriate," the "order of the CAP granting a transfer . . . will be effective" after 15 days. *Id.* (citing Minn. Stat. § 253D.28, subd. 3). "Thus, after the issuance of the CAP transfer order and the passing of the 15-day waiting period (assuming no appeal is taken in accordance with Minn. Stat. §§ 253D.28, subd. 4, and 253B.19, subd. 5), the transfer becomes *mandatory*." *Id.* (emphasis added). The supreme court in *McDeid II* expressly rejected respondents' argument that a "CAP transfer order is ultimately not binding on them." *Id.* at 875. The supreme court summed up by stating that, under the statutory scheme, "transfer orders issued by the CAP are mandatory and the State Officials do not have the discretion to ignore CAP transfer orders." *Id.* at 876-77; *see also Walters v. Grossheim*, 990 F.2d 381, 384 (8th Cir. 1993) (concluding that "state court order gave [prisoner] a liberty interest in being restored to" more favorable custody status), *cited in McDeid II*, 984 N.W.2d at 871, 878.

Thus, appellants have a protected liberty interest in being transferred to CPS pursuant to a CAP transfer order.

**2.**

We next consider whether appellants have a protected property interest in being transferred to CPS pursuant to a CAP transfer order. Respondents contend that appellants

7

have not identified a property interest that is implicated by the CAP transfer orders. In their reply brief, appellants do not identify a particular interest in property that is affected by a CAP transfer order and do not cite any caselaw recognizing a protected property interest in circumstances similar to this case. The interest that appellants seek to protect is different from the interests in the leading cases concerning property rights. *See, e.g.*, *Board of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (public-sector employment); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits). Thus, appellants do not have a protected property interest in being transferred to CPS pursuant to a CAP transfer order.

**3.**

We next consider whether respondents have interfered with or deprived appellants of their protected liberty interests. It appears to be undisputed. Respondents do not make an alternative argument that, if appellants have a protected liberty interest, appellants were not deprived of that interest. The absence of such an argument is consistent with the fact that respondents did not transfer appellants to CPS for 796 days and 902 days after the effective dates of their CAP transfer orders. The facts of this case are similar to the facts of a federal case cited in *McDeid II*, in which the federal circuit court concluded that state officials "deprived [appellant] of his liberty interest in being restored to the less restrictive environment of" a more favorable custody status level. *Walters*, 990 F.2d at 384. Thus, appellants were deprived of their protected liberty interests when they were not transferred to CPS immediately after their CAP transfer orders became effective.

8

**B.**

We proceed to the second part of the two-part inquiry: "whether the procedures attendant upon that deprivation [of a protected interest] were constitutionally sufficient." *See Carrillo*, 701 N.W.2d at 768.

This issue was the focus of the district court's order. The district court cited *Mathews v. Eldridge*, 424 U.S. 319 (1976), which provides a means of determining the process that is constitutionally required in a particular case based on a consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335. With respect to the first factor, the district court stated that each appellant's interest is important and "weighs in favor of more process." With respect to the second factor, the district court reasoned that "additional procedures, such as a formal notice and opportunity to be heard" would not have "reduced the possibility of erroneous decision-making" and "would have negligible impact on the length of time a person must wait for placement at CPS." The district court did not expressly consider the third factor. The district court concluded that the procedures utilized by respondents were constitutionally sufficient because "verbally informing [appellants] of their status, maintaining an orderly waitlist, and allowing [appellants] the opportunity to challenge the government's decisions

9

related to the delay in implementing a CPS Order via internal grievance or a Motion to Compel is the process that is due."

Both appellants and respondents cite *Mathews*, but neither side actually applies the *Mathews* balancing test. Appellants cite *Mathews* for the principle that "some form of hearing is required before an individual is finally deprived of a property interest" and that due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner." 424 U.S. at 333 (quotation omitted). Respondents cite *Mathews* in support of an assertion that a pre-deprivation hearing is required only if a person would be deprived of "the very means by which to live while he waits." *Id.* at 340.

We question whether the *Mathews* balancing test applies in this case. The *Mathews* balancing test initially was "conceived to address due process claims arising in the context of administrative law." *Medina v. California*, 505 U.S. 437, 444 (1992) (citing *Mathews*). The test later was applied to judicial procedures that may deprive a person of a protected interest. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 757-70 (1982) (applying *Mathews* to judicial procedures concerning termination of parental rights); *Addington*, 441 U.S. at 425-27 (applying *Mathews* to judicial procedures concerning involuntary and indefinite civil commitment). We are mindful of caselaw stating generally that the *Mathews* balancing test is "require[d]." *Sawh*, 823 N.W.2d at 632. But we also are aware that the United States Supreme Court has "never viewed *Mathews* as announcing an all-embracing test for deciding due process claims." *Dusenbery v. United States*, 534 U.S. 161, 168 (2002). The United States Supreme Court has expressly held that the *Mathews* balancing test does not apply to due-process claims in certain contexts. *See id.* at 167-68 (applying

10

reasonableness test to constitutionality of FBI's notice of forfeiture of property of prisoner); *Weiss v. United States*, 510 U.S. 163, 177-78 (1994) (resolving due-process challenge to authority of military judges by asking "whether the factors militating in favor of [asserted right] are so extraordinarily weighty as to overcome the balance struck by Congress"); *Medina*, 505 U.S. at 443 (stating that "*Mathews* balancing test does not provide the appropriate framework for assessing the validity of state procedural rules which . . . are part of the criminal process"). We are unaware of any precedential caselaw expressly stating that the *Mathews* balancing test does or does not apply to an executive-branch agency's failure to comply with a court order.

The supreme court's prior opinion in this case tends to indicate that the vindication of appellants' protected liberty interests is not subject to a balancing test. To be sure, the *McDeid II* opinion is focused on respondents' qualified-immunity defense, but the opinion discusses at length appellants' clearly established rights and respondents' corresponding obligations, without mentioning or applying the *Mathews* balancing test. *See* 984 N.W.2d at 871-79. The supreme court stated categorically that the relevant statute "does not allow the State Officials to ignore the transfer order" and that "they must perform that statutory duty within a reasonable time." *Id.* at 878. That statement of respondents' obligations is, in effect, a statement of appellants' rights. In its summation, the *McDeid II* opinion emphatically states—without having mentioned *Mathews*—that "bedrock principles of law concerning the duty of public officials to follow court orders" compel the conclusion that "compliance with a CAP transfer order must occur within a reasonable time." 984 N.W.2d at 879. Furthermore, in *Walters*, which was cited in *McDeid II*, the federal circuit court

11

did not apply the *Mathews* balancing test but nonetheless concluded that state officials violated a prisoner's right to due process by not transferring him to a more favorable custody status, as required by a court order. 990 F.2d at 384; *see also Slone v. Herman*, 983 F.2d 107, 111 (8th Cir. 1993) (resolving first part of qualified-immunity analysis by concluding that state officials violated plaintiff's right to be released from prison pursuant to court order "after it had become final and nonappealable," without applying *Mathews* balancing test).

We need not decide whether application of the *Mathews* balancing test is required in this case because, even if we apply it, we reach the same conclusion. First, appellants' protected liberty interests in being transferred to CPS pursuant to their CAP transfer orders are important interests. *See Addington*, 441 U.S. at 425 (recognizing that "civil commitment for any purpose constitutes a significant deprivation of liberty"). Courts have described CPS as "a residential setting outside of the secure perimeter of the facility" with a "less restrictive environment," *McDeid II*, 984 N.W.2d at 868-69, where patients receive certain "privileges," *In re Civil Commitment of Fugelseth*, 907 N.W.2d 248, 256 (Minn. App. 2018), *rev. denied* (Minn. Apr. 17, 2018); *In re Civil Commitment of Duvall*, 916 N.W.2d 887, 890-91 (Minn. App. 2018), *rev. denied* (Minn. Sept. 18, 2018). In addition, transfers to CPS allow "patients to progress towards discharge," *McDeid II*, 984 N.W.2d at 868, by "developing the appropriate skills and resources necessary for an eventual successful reintegration into a community," Minn. Stat. § 246B.01, subd. 2a (2024). Second, there was a high risk—indeed, a near certainty—of an erroneous deprivation of appellants' protected liberty interests associated with the process (or lack thereof) that

12

respondents provided to appellants. In addition, the additional procedures that respondents have identified would not have reduced the risk of an erroneous deprivation of appellants' protected liberty interests. This is evident from respondent Johnston's deposition, in which she testified that, even if appellants had submitted a client-request form, invoked an internal grievance procedure, or moved for a finding of contempt, such actions would have had no effect on the date when they were transferred to CPS. Furthermore, a contempt proceeding would not be a constitutionally sufficient process because it is not a procedure that respondents would provide to appellants but, rather, is a remedy that appellants could have elected to pursue, but only *after* their rights had been violated. *See Rud v. Johnston*, No. 23-CV-486, 2023 WL 6318615, at *6 n.3 (D. Minn. Sept. 28, 2023) (reasoning that "Plaintiffs' ability to bring contempt proceedings in state court . . . does not constitute procedure at all"). Third, the state does not have a valid interest in ignoring a court order requiring a transfer to CPS, and the fiscal and administrative burdens of a transfer, though significant, must yield to a person's court-ordered right to a transfer. Accordingly, a balancing of the three *Mathews* factors leads to the conclusion that the process provided by respondents was insufficient and that the process that was due to appellants was a transfer to CPS within a reasonable time. *See Rud v. Johnston*, No. 23-CV-486, 2025 WL 2636455, at *7 (D. Minn. Sept. 12, 2025) (applying *Mathews* balancing test and concluding that lack of procedures did "not comply with procedural due process").

Whether or not the *Mathews* balancing test applies, each appellant may establish a violation of his right to procedural due process if he can prove that respondents did not transfer him to CPS within a reasonable time of his CAP transfer order. *McDeid II*, 984

13

N.W.2d at 877. The reasonableness of the time periods between the effective dates of appellants' CAP transfer orders and their actual transfers (796 days and 902 days, respectively) is a question of fact, which "usually" is "for the jury" or factfinder. *Id.* at 877 n.6; *see also Glacial Plains Coop. v. Chippewa Valley Ethanol Co.*, 912 N.W.2d 233, 237 (Minn. 2018). In this case, we conclude that there is a genuine issue of material fact as to whether respondents transferred appellants to CPS within a reasonable time after their CAP transfer orders became effective and, thus, whether respondents violated appellants' rights to procedural due process. *See Rud*, 2025 WL 2636455, at *8 (denying defendants' motion for summary judgment and defining "issue for trial" as whether plaintiffs were "transferred to CPS within a reasonable amount of time, which depends on what constitutes a 'reasonable amount of time'").

Thus, the district court erred by granting respondents' motion for summary judgment but did not err by denying appellants' motion for summary judgment.

## II. Qualified Immunity

The district court did not address the issue of qualified immunity, even though both sides presented arguments on the issue in their summary-judgment papers. On appeal, appellants request that this court nonetheless consider the issue and "dismiss" the defense. Respondents request that this court consider the issue as an alternative ground for affirmance of the district court's grant of summary judgment. In reviewing a grant of summary judgment, an appellate court "need not adopt the reasoning of the district court" and "may affirm a grant of summary judgment if it can be sustained on any grounds." *Doe v. Archdiocese of St. Paul & Minneapolis*, 817 N.W.2d 150, 163 (Minn. 2012).

14

Accordingly, it is appropriate to consider respondents' argument for affirmance on an alternative ground. *See McGuire v. Bowlin*, 932 N.W.2d 819, 828 (Minn. 2019); *Day Masonry v. Independent Sch. Dist. 347*, 781 N.W.2d 321, 331 (Minn. 2010); *Keystone Twp. v. Red Lake Watershed Dist.*, 989 N.W.2d 897, 906 (Minn. App. 2023), *aff'd*, 20 N.W.3d 612 (Minn. 2025).

Qualified immunity is a judicially created "affirmative defense available to public officials sued for damages under" section 1983 for actions taken in their official capacity. *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 674 (Minn. 1988) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). The defense shields public officials from being sued, even if an official has violated a person's constitutional right. *McDeid II*, 984 N.W.2d at 871. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

As the supreme court stated in *McDeid II*, the defense of qualified immunity is determined according to "an objective, two-prong test," which is concerned with "(1) whether the plaintiff alleged facts showing the violation of 'a federal statutory or constitutional right,' and (2) whether that right was 'clearly established' at the time of the alleged violation." 984 N.W.2d at 872 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018)). The supreme court noted that "the two questions are often intertwined." *Id.* The supreme court determined the second part of the two-part test by concluding that

15

respondents "had a clear obligation to execute the CAP transfer orders within a reasonable period of time." *Id.* at 879.

The remaining question is the first part of the two-part qualified-immunity test. *See id.* at 872. On a motion for summary judgment, the first part of the two-part test "asks whether the facts, taken in the light most favorable to [the plaintiff], show" a violation of a constitutional right. *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (*per curiam*) (quotation omitted). That question is functionally equivalent to the question we considered in part I of this opinion. We concluded that, in light of the discussion in *McDeid II* of appellants' clearly established right, each appellant may establish a violation of his right to procedural due process if he can prove that respondents did not transfer him to CPS within a reasonable time of the effective date of his CAP transfer order. We further concluded that there is a genuine issue of material fact concerning the reasonableness of the time periods between the effective dates of appellants' CAP transfer orders and their actual transfers.

Thus, respondents are not entitled to summary judgment on the issue of qualified immunity.

### III. Damages

Both appellants and respondents make arguments concerning damages. The district court did not address the issue of damages. The issue is best addressed by the district court in the first instance. Thus, we decline to consider the parties' arguments concerning damages.

16

In sum, the district court erred by granting respondents' motion for summary judgment but did not err by denying appellants' motion for summary judgment. Therefore, we reverse and remand for further proceedings not inconsistent with this opinion.

**Reversed and remanded.**